Good morning again. May it please the court. My name's still Eitan Kaslyanich. I'm representing Sharon Molyneux in this appeal. Molyneux applied for disability benefits in July of 2005, nearly eight years ago. These applications are missing from the record. This has become a regular feature of the Social Security system where applications don't even show up in the court transcript. She reapplied for disability benefits in May 2006. She's alleging she hasn't been able to work since April 2004. I'd like to focus now on the ALJ's main errors that require reversal here. First and foremost is the ALJ's failure to even address some of the opinions of Dr. Shane Dunaway. Dr. Dunaway was Molyneux's treating physician. He was treating her primarily for anxiety and depression. He also treated her for her physical problems, including back and hip pain. But for the most part, for the physical problems, he referred her out to specialists that were providing her with injections and other care. He was also the person that was prescribing medications to her. In May of 2005, he wrote in one of his treatment notes that she had been given a prescription for a cane. He didn't identify who had prescribed it or when. It may have been before him, it may have been what she said. In any event, he wrote it in one of his reports. Did he say prescription or did he just note that she had a cane? He actually, in one note, he wrote that she had been given a prescription for a cane. That was in May of 2005. Then in August of 2005, she came to see him and he wrote in his treatment note, she's continuing to ambulate with a cane. So he noted there she was using it. And then, oh my God, three and a half years later, he wrote a short note in which he wrote, I guess she had been asking, you know, what am I supposed to do? Because she was having these physical problems and mental problems. And he, as far as the physical capacity, wrote that he didn't know what her capacity was. He doesn't, he's not a, that's not his specialty to measure an individual's physical capacity. So he thought maybe someone should evaluate her to precisely determine that. But he also wrote, intuitively, I think that she, the patient, would be able to perform some sedentary type work, but I will get assessment from physical therapy, PT. Okay. That treatment note is never mentioned by the ALJ. The ALJ also finds that Ms., that Molyneux is not credible, in part because she's claiming that she needs to use a cane, which also by, she was using it at the hearing, but she's claiming this. And the ALJ says, well, there's no evidence in the file in any of the medical treatment notes of this need for a cane. So what was the ALJ doing? The ALJ was adopting an assessment form that had been completed by a state agency physician in which they had written a little comment that no MR, M-E-R, is medical evidence of record, shorthand at the state agency. There was no MR regarding, that mentions a cane. Well, there was MR that mentioned the cane. There were two references to it. Okay. Now, back to Dr. Dunaway saying she's still ambulating with a cane. And that's one thing. Let's set aside Dr. Dunaway for a moment because I think some of the notes that you're relying on from Dr. Dunaway I think aren't really medical opinions. Like, for example, the one you mentioned that he thought it was intuitive and he referred her out for further testing or examination. I see the medical evidence in this case as a situation where you have conflicting medical opinions. And so, so long as the record shows a legitimate reason that's articulated for why certain medical opinions are credited more than others, why shouldn't we defer to that? Okay. First of all, no reason is articulated for regarding Dr. Dunaway's opinion. Now, I know his opinion is not crystal clear. That's, you know, he intuitively thinks that this is what she probably could do. But social security does not require certainty. The standard within the administrative decision process is preponderance of the evidence. Sure. But he wasn't the only doctor who actually examined her, right? There was also Dr. Lutkowitz, Dr. Carter. And then their opinions are contradicted. No. In fairly significant respects, I think, by Drs. Moore and Bowerly. Okay. No doctor said that, no doctor contradicted Dr. Dunaway's opinion that she was limited, was probably limited to sedentary work. There's no, there's no treating or examining physician that said that, I think she could do more than that. So I'm not arguing that, I don't even have to argue that the convincing legal standard is involved here. Because the fact is the ALJ didn't even mention it. He didn't give any reason at all. He didn't articulate, he didn't acknowledge it existed. He didn't articulate any reason at all for rejecting it. So we don't even get into legitimate land here because he didn't say anything. Okay. Jumping over to the, what you pointed out regarding the records of mental health issues. Dr. Carter's opinion, she evaluated Molyneux twice. And her opinion is, obviously it's the one we like the best because it helps her case the most. But more importantly than that, it's because she'd seen her twice, she had a little bit of a, more of a longitudinal view of things. And I do point out that in my briefs that the ALJ didn't state any legitimate reasons for rejecting her assessment, her reasons for finding that, and opining that Molyneux had some marked limitations in her social functioning. And so, you're right, because there are, there is contradictory evidence on it, the legal standard is specific and legitimate. And the reasons the ALJ gave for rejecting Dr. Carter's opinion are not specific and legitimate. The other thing that I point out that I think is important here is Dr. Luckwitz was treating, well, first Dr. Thompson was also doing this, and I think, I'm not sure if Dr. Gandy also gave her epidural shots, but she'd been getting a series of shots to treat her pain. And the shots were somewhat, were effective. As Dr. Luckwitz pointed out, she got excellent relief from them. And Dr. Luckwitz defined excellent as a 50% reduction in her pain. And so, the ALJ saw the excellent word and said, look, she's getting excellent relief, therefore she has no problem. That's not what Dr. Luckwitz was saying. So, if the ALJ wants to point to Dr. Luckwitz's opinion and his evidence and say, well, look, she's getting excellent relief, you can't stop there. You've got to look at how Dr. Luckwitz defines excellent. The other thing that's important is that you can only have- Which is 50% reduction. That's a pretty good return. That's why she kept going back. 50% reduction is awesome. When you've got overwhelming pain, a 50% reduction is wonderful. The other thing, though- That is excellent relief. It's excellent relief, but it's not complete relief. It means she's still got 50% of that pain. And how do you measure that 50%? If pain is not something you can put on a- There's no way for either of us, anyone, even her doctors, to tell what she's actually feeling. You have to ask her. The problem is, in order to find out what she's feeling, you've got to ask her. The ALJ rejected her description of what she was feeling, in part because the ALJ said, well, look, Dr. Luckwitz said excellent relief. Therefore, I reject your statement about the pain you were continuing to experience, even with excellent relief. The other thing about the relief, you can only have an epidural shot every three months. The shots only lasted two to two and a half months, which left her with one half to a month, four times a year, where the pain was back to the excruciating level. No explanation by the ALJ for why he's rejecting her description of the pain she was experiencing then. Does the record show what medication she was taking? At the time, she was only taking muscle relaxants. I'm sure it's in the record, in Dr. Dunaway's notes probably, and Dr. Luckwitz's. She was only taking the muscle relaxants because she had a history. She had been addicted to heroin earlier and was on a methadone maintenance program for that. As a result of that, she didn't want to have anything to do with narcotic pain medication, and her doctors agreed with her that that was wise. So that wasn't another option available to her for reducing pain. All she could do was muscle relaxants and other medications and the four times a year epidural steroid injections. Oh, the other thing I mentioned in discussing her credibility, one of the other ALJ's other main reasons, this gets back to Dr. Dunaway saying, well, she's ambulating with a cane, it's been prescribed to her, at least that's what he wrote. It's funny, we don't have any record of any prescription. I looked at the notes after you mentioned that, and it's true. The main notes do say she was prescribed a cane, but do you know? You know, I don't know if it was in 04, if it was in an earlier time period. I don't know if it was even in records, medical records that were in her prior file that was part of her prior application that is missing from the record here because Social Security doesn't include all of the records in a transcript. Not just the transcript, it wasn't even included in the hearing record. I did not represent her at the hearing. If I had, I'd like to think I would have figured that out and tried to find the reference to the prescription. But once again, let's even assume it wasn't prescribed, she just needed it. Dr. Dunaway was her treating physician, he didn't question that she needed it, and the record shows that she was using it, but the ALJ rejected her testimony about her limitations because supposedly the medical evidence had no reference to a cane, no mention of a cane. Not that it hadn't been prescribed, he said no mention of a cane, that's wrong. It's not a convincing, obviously not convincing, it's not even any kind of reason to reject her testimony about her symptoms and limitations. I would like to reserve some time for questions. Certainly, you bet. Thank you. We'll hear from the government. Good morning, Honors, may it please the Court. Sarah Martin for the Commissioner. This Court should affirm for three reasons. There was no medical evidence that Ms. Molyneux's low back condition was more limiting than the ALJ found. The ALJ properly weighed conflicting medical opinions regarding Ms. Molyneux's depression and its limiting effects, and the ALJ gave numerous clear and convincing reasons for discounting her subjective complaints, including that she enjoyed her work as a volunteer, got along well with her coworkers, and was dishonest about her prior drug use. First, just to correct one misstatement, Ms. Molyneux was taking Vicodin by the time of the hearing, she testified to that, in addition to muscle relaxers and I believe an antidepressant she was still taking. So it's not the case that narcotic medications were out of the question for Ms. Molyneux. She also took Vicodin for a shoulder injury that's on the record at page 503-05. So that was one option, although there was also a note in Dr. Dunaway's one treatment note that he might not prescribe it for her. Did the ALJ address Dr. Clifford's assessments as to mental function limitations? I'm sorry, Dr. Clifford? Clifford. State agency psychologist? Oh, the state agency. I believe the state agency physician or psychologist found no severe mental impairments at one point, and the ALJ did not give that weight because there was evidence that she had a mental impairment of depression. Is the answer to my question no? The ALJ did consider it, yes. Okay. In writing? Your Honor, I'll have to check and get back to you. There were two different state agency, two to four different state agency psychologists. Were there two Dr. Cliffords? No, Your Honor, I don't believe so. Typically, the ALJ does not list the state agency psychologist by name, but just refers to them as the state agency doctor. So I know that there was one state agency psychologist who found no severe mental impairments, and the ALJ said that that was not the case. Dr. Clifford found some moderate mental functional limitations. They're in the record, and the ALJ didn't address them at all. Oh, yes, Ms. Maloney raised that in her brief. Those moderate mental limitations were in a section of the report that he's filling out that is a summary section, and that report instructs the psychologist to summarize any limitations, any resulting limitations on the last page of the report. And that state agency psychologist found that despite those moderate limitations, Ms. Maloney retained the ability to concentrate and perform simple tasks and some more complex tasks and maintain occasional contact with or superficial contact with the public and with coworkers, which the ALJ accommodated in the residual functional capacity. So those moderate limitations are a red herring, essentially. The psychologist found she had some limitations but still retained certain abilities, and that was Dr. Clifford's opinion. A state agency medical professional offers observations, opinions about limitations, and the ALJ says nothing about them. And your stated reason for that is that the limitations Dr. Clifford described were red herrings? No, I'm saying the argument is a red herring. The agency's POMs, administrative rules, instruct the ALJ and the state agency reviewing physician to consider the last page of the report, the conclusion section of the report to be what the residual functioning capacity findings are. I thought your response to my question would have been, yes, he didn't address them. Perhaps that's error, but it's harmless in light of the entire record. It's a little complicated given the form, Your Honor, but it is not error. It's complicated about admitting that the ALJ ignored Dr. Clifford. The ALJ did not ignore it. The form instructs the state agency doctor to start by listing restrictions and then conclude by summarizing what mental abilities the claimant has given those restrictions and that that constitutes the opinion, and the ALJ is instructed to weigh that opinion and assign what weight is given to that opinion. And where in the record is that reflected, what you just described? It's on the form itself. The ALJ. Where in the record does it show that the ALJ said, I looked at what Dr. Clifford offered and I'm ignoring that or I'm disregarding that and here's why. I don't recall which exact page number of the ALJ's decision that discussion is on, but the residual functional capacity finding mirrors the state agency reviewing psychologist's conclusions and findings. So he accommodated that doctor's opinion in its totality, and the form itself is where it's described that that initial section is not the opinion but is the summary of the restrictions that are later to be incorporated into an opinion, which the ALJ is to consider. Did that answer your question? Not really. I can grab. I'm either addressed them or he didn't. That's the starting point here. And my reading of the record is that he didn't. Now, maybe in light of the overall findings and determinations, it's harmless, but he didn't. He did address that psychologist's opinion. He did not address each page of the report where that psychologist listed off different findings. ALJ is required to weigh medical opinions. The ALJ is not required to list every single notation in every medical record that is contained in the file. Would you explain to me, Doctor, the form that Dr. Clifford used? Because he goes through the form and checks it. In fact, at one point he uses an initial where it says mild, and he crosses that with initial and puts moderate. Okay? Okay. But then at the final page, the summary to which you're referring is not signed by Dr. Clifford. It's signed by an adjudicator. So if – can you explain that? I mean adjudicator who's not a medical physician. Yes, there's usually another page in the record where a person affirms that. So it can be a little convoluted figuring out which doctor signed which. This is signed. I'm looking at Excerpt of Record 315. It's signed by Karen Byer, adjudicator. Now, there's a notation, a consultant at the bottom. He's signing off. But, I mean, it looks to me, and you can correct me if I'm wrong, that actually the summary is prepared by Ms. Byer, the adjudicator, and not by Dr. Clifford, although he signs a little notation at the bottom. But the check marks are actually filled out by Dr. Clifford, and we know that because he initials them. Yes, Your Honor. I'm looking at page 315, and his signature does appear at the bottom there. And the way these forms are – Just bear with me. So am I correct in assuming that the summary that's signed by Ms. Byer above is her work, not his? Your Honor, she wrote that, and he signed off on it, making it his opinion. And this is how these forms are always filled out. This is the typical way. Assuming a single decision-maker – So she fills out the form but does not do the examination? Or she fills out the summary based on his notes? Is that the way it works? No, Your Honor. No examination was done. This is a reviewing psychologist who reviewed records and rendered an opinion. And so neither of them examined her in rendering this opinion. It's not clear to me who filled out the checkmark boxes. Well, it has to be him because he initials them. I'm looking at – let's see. I guess I'm not looking at the same page you are because I don't see initials on page 313 or 314. I'm looking at page 309. Looks like a TC to me. I'll take your word for it, Your Honor. That page is over at my desk. But his signature at the bottom of page 315 indicates that this is his opinion. And at the top it says functional capacity assessment. And this indicates that this is his opinion regarding her mental abilities or limitations. And the ALJ fully accounted for this opinion, and it is consistent with the residual functional capacity finding. As I mentioned before, on page 313, it explains that this is a summary and that any limitation, as well as any other assessment information, is to be recorded in Section 3. And Section 3 indicates that this is the opinion regarding the person's functional capacity. So back to Your Honor Judge Hawkins' question earlier, the ALJ did not ignore this evidence. The ALJ is not required to list every note from every medical note, but to discuss and weigh opinions. And the opinion is contained on page 315. And that's also in the agency's POMS manual that instructs ALJs that that is what they are to do. Similarly, regarding the point that the ALJ is not required to discuss every notation in every medical record, but only explain why significant probative evidence has been rejected, the note that Ms. Maloney was using a cane was not an opinion that she needed a cane. It was mentioned twice in the treatment records after Ms. Maloney had a car accident. And although she mentioned she was given a prescription for a cane, there is no indication in the medical record of any such prescription or that any doctor felt that she needed a cane. So you think Dr. Dunaway was just lying? No. When he said that she had a prescription for a cane? No, Your Honor. He did not say that. He noted in the subjective portion of the report that she reported that to him. So it basically boils down to her subjective statement that she claimed that it had been prescribed for her, but there's no evidence that that was actually true. He did observe her using one on that day, but it was nothing more than her subjective belief that she needed a cane. I guess we might be reading a different record. Let me pull it up here. She did tell him that it had been prescribed for her. What he says is the patient had been given a prescription for a cane. Yes, Your Honor, and that sentence occurs in the subjective portion of the treatment notes. So he's simply documenting what she's telling him and what she claims her symptoms are on that day. There's no, under the case of Thomas v. Barnhart. I see what you're saying. Under Thomas v. Barnhart, that case specifically holds under facts almost identical to this, that when there is no objective evidence that a person needs a cane, the ALJ is not required to accommodate that if he has given clear and convincing reasons to discount her subjective statements, her credibility. And in this case, the ALJ gave numerous clear and convincing reasons to discount her statements, including the fact that she made dishonest statements to several examining psychologists about her past drug use. Dr. Moore concluded as a result of that that her inconsistent self-report clearly places into question her overall reliability as a historian. The ALJ did not discount her credibility, as Ms. Molyneux claimed, based on the cane. That was not part of the credibility analysis. Rather, he found that her daily activities, including volunteering at a thrift store four hours a day, three days a week, the fact that she went shopping, did household care, including vacuuming, that she took up walking, she was involved in her church, all these activities conflicted with her allegations of physical and mental limitations. The ALJ found that her allegations were inconsistent with the medical record, inconsistent with her improvement with conservative treatment, including the injections that we've already discussed. Regarding the epidural steroid injections, there is nothing in the law that would require a 100 percent complete relief of pain in order for an ALJ to be able to rely on that fact. Here, there's also no evidence that the ALJ misunderstood the records or mischaracterized them in any way. He simply noted and quoted Dr. Thompson's, excuse me, Dr. Leckwitz's statement that she had excellent pain relief from the injections. And I would also note that on a couple of records, it says something about 50 percent pain relief, and some it does not. It just says excellent. Dr. Thompson also noticed that she had a 70 percent pain relief at one point from the injections. The ALJ did not say that she was pain free or that she had 100 percent pain relief, as Ms. Molyneux argued, but simply that that excellent relief she was getting was consistent with her improvement and was inconsistent with her allegation of totally disabling pain. She also made weak excuses for not going to mental health counseling, despite being told numerous times that that was advisable, as Dr. Moore noted, and she was participating in employment services. So for all of these reasons, the ALJ properly discounted her subjective complaints. Regarding Dr. Dunaway's statement, it was not a medical opinion, again, that the ALJ was required to weigh. It was a statement that he was not clear what his opinion was regarding her abilities or what her abilities were, and so the ALJ did consider Dr. Dunaway's treatment notes, but he was not required to specifically address that statement because that statement was not a medical opinion. Regarding her depression, as Your Honor pointed out earlier, there were conflicting opinions regarding what limitations she had from her mental health condition, and Ms. Molyneux continues to assert that the ALJ did not give specific and legitimate reasons for discounting portions of Dr. Carter's opinion, although still has not explained what was not specific or legitimate about the reasons the ALJ gave. Although Dr. Carter saw Ms. Molyneux twice, Dr. Moore examined her five times, and after numerous testing found that she had no difficulties in the ability to reason, understand, concentrate, persist, and interact socially. The ALJ found Dr. Carter's opinion that she had some moderate cognitive limitations and one marked social limitation to be inconsistent with all of the psychological testing in the record that showed that she had no cognitive limitations, that she had near-perfect scores consistently on cognitive testing, and his opinion was also inconsistent with Dr. Carter's own findings that she could reason, understand, and relate appropriately to others, as well as the numerous daily activities, social activities that Ms. Molyneux. You're about a minute over. Oh, I'm sorry, Your Honor. I did not say that my time had expired. I apologize for that. Why don't you? I thought it was. Thank you. May I please ask the Court to affirm? Thank you. Thanks. It's a common mistake when you go over and you think you have more time, but you're actually losing time. Go ahead. First, I stand corrected. She was taking Vicodin at the time of the hearing. But there were, as was noted, they generally were trying not to prescribe these medications to her, and she was trying to avoid them as well, as much as she could. I'd like to point to what you were discussing about. It's on page 315 in the transcript. And this is kind of interesting because the government's arguing, and they do this regularly. They say, well, technically under the POMS, the checkboxes aren't anything. They're just a summary statement, and then they're supposed to, you know, that's a guide. It's a worksheet. So then they can then incorporate that into the narrative, which is on page 315. Now, that makes sense if the two match. In other words, you check a bunch of boxes, and then on page 315, it would theoretically summarize everything that's in those boxes. Well, it doesn't usually work that way. Well, I gather the way it works is this, is that Dr. Clifford went down and made the checkboxes. The evaluator then summarizes. He takes the records. He doesn't examine anybody. He checks the boxes. And in this case, he goes from mild to moderate in some categories. The evaluator then checks the check, determines from the checkboxes what creates a narrative, and then at the end of it, he signs off on it, right? Right. Now, we don't know. We don't. We have no way of knowing who actually checked the boxes on the mental residual functional capacity assessment. That's at pages 313 and 314. There's no way to know that for sure. But... Well, his initials are prior to that, and it looks like the checkboxes are... Well, they're sort of separate forms. I know. But even assuming that she checked them or he checked them, whoever checked them, he reviewed it. I'll grant him that. Because he signed it, that makes it medical evidence. I'll grant him that. But on that page 315, there's an important... At this point, it's not addressed in the ALJ report. Yes. Well, first of all, the pages 313 and 314, all those checkboxes are not addressed. But on page 315 in the narrative, it states, let's see, she may... Okay, here we go. She may have some occasional interruptions during her work day and work week due to her condition. That's the narrative. That's the narrative he adopted. That's not in his residual functional capacity assessment. So not only did he not address the checkboxes, he also didn't address or include that statement from the narrative. Let's see. With regard to Dr. Carter and the reasons for rejecting her opinion, that's what I'm looking at here. Yes, there's conflicting evidence. The ALJ could have rejected her opinion if he provided specific legitimate reasons to do so. But his reasons, read them from his decision. He says she's able to relate appropriately to others, this is what he wrote, despite presenting as easily tearful. She was crying when Dr. Carter was interviewing her. Dr. Carter wrote down that she had PTSD symptoms of crying, thinking about the traumatic event, becoming upset. Just because it seems, and once again looking at the record as a whole, it seems like over time her mental functioning actually got worse. And certainly at the time of the hearing, the ALJ didn't state any convincing reason for rejecting that part of Dr. Carter's opinion. How do you deal with the ALJ's credibility findings, adverse credibility findings? Well, there's so many huge mistakes in it that it caused him to question the overall, his entire credibility analysis. Give me one example. Well, one big example is he states, if the claimant were as limited as alleged, one would expect to find more substantiating examination findings. Fair enough, right? Except in his decision he does note the January 2008 lumbar spine MRI, which has very significant findings. So he mentions it as a fact in his decision, but then he says I reject your credibility because there aren't substantiating findings when he just mentioned this finding. It's a huge substantiating finding, and there was this disconnect between the facts he mentions in his decision, the facts, the evidence from the transcript, and his statement that there's no evidence. It doesn't disappear just because he says it isn't there. Thank you, counsel. I think I equalized the time. Any further questions from the panel? Thank you for your presentation. The case will be submitted for decision and will be on recess for 15 minutes. Thank you.
judges: Hawkins, Thomas, Nguyen